RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0172p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JOHN C. MCLEMORE, Trustee,
        *Plaintiff-Appellant* (10-5480),

EFS, INC, et al.
        *Plaintiffs-Appellants* (10-5491),

    *v.*

REGIONS BANK, as Successor in Interest by
Merger to AmSouth Bank,
        *Defendant-Appellee*.

Nos. 10-5480/5491

Appeals from the United States District Court
for the Middle District of Tennessee at Nashville.
Nos. 08-00021; 08-01003—Aleta Arthur Trauger, District Judge.

Argued: March 1, 2012

Decided and Filed: June 8, 2012

Before: MERRITT and COOK, Circuit Judges; and COX, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Robert M. Garfinkle, GARFINKLE, MCLEMORE & YOUNG, PLLC, Nashville, Tennessee, H. Naill Falls, Jr., FALLS & VEACH, Nashville, Tennessee, for Appellants. John R. Wingo, FROST BROWN TODD LLC, Nashville, Tennessee, for Appellee. Leonard H. Gerson, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Robert M. Garfinkle, Phillip G. Young, Jr., GARFINKLE, MCLEMORE & YOUNG, PLLC, Nashville, Tennessee, H. Naill Falls Jr., FALLS & VEACH, Nashville, Tennessee, for Appellants. John R. Wingo, FROST BROWN TODD LLC, Nashville, Tennessee, Matthew C. Blickensderfer, FROST BROWN TODD LLC, Cincinnati, Ohio, for Appellee. Leonard H. Gerson, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Curiae.

---

[*]The Honorable Sean F. Cox, United States District Judge for the Eastern District of Michigan, sitting by designation.

COOK, J., delivered the opinion of the court, in which COX, D. J., joined. MERRITT, J. (pp. 18–21), delivered a separate dissenting opinion.

─────────────────

**OPINION**

─────────────────

COOK, Circuit Judge.  These consolidated appeals stem from the misconduct of Barry Stokes, an investment advisor who purloined millions of dollars from the employee-benefits plans that he managed.  Stokes and his company, 1Point Solutions, LLC ("1Point"), held the fiduciary accounts of the defrauded plans—along with Stokes's personal accounts—with Defendant-Appellant Regions Bank ("Regions").  Plaintiffs-Appellants John McLemore, Stokes's bankruptcy trustee ("the Trustee"), and several former clients of 1Point (collectively, "EFS") allege that Regions negligently or knowingly allowed Stokes to steal from the fiduciary accounts held at Regions.  The Trustee sued Regions under the Employee Retirement Income Security Act ("ERISA"), and both EFS and the Trustee brought state-law claims.  In 2008, the district court dismissed the Trustee's ERISA claims.  In 2010, the district court found that ERISA preempted both plaintiffs' state-law claims and granted judgment on the pleadings in favor of Regions.  The Trustee appeals the district court's 2008 dismissal of its ERISA claims, and both parties appeal the 2010 dismissal of their state-law claims.  We AFFIRM.

I.

Plaintiffs allege the following.  Stokes served as the sole owner and operator of 1Point, which managed various employee-benefits plans and 401(k) retirement plans as a third-party administrator ("TPA").  1Point also acted as TPA for a number of flexible-spending accounts, health-savings accounts, dependent-care accounts, and various other "cafeteria plans," all of which allow employees to set aside pre-tax income for qualifying purposes.  ERISA governed the majority of the plans that 1Point serviced.

From the outset, Stokes operated 1Point unlike an ordinary TPA. TPAs generally provide record-keeping services and assist in transferring money, but do not themselves handle money or securities. Stokes, however, directed clients to send funds to accounts at Regions that he had opened in 1Point's name. The accounts, which Stokes and 1Point controlled, held substantial funds: in the accounts at Regions, plaintiffs estimate that 1Point's 401(k) Plan clients deposited over $5.7 million and 1Point's Cafeteria Plan clients deposited $45 million.

Regions advised Stokes and 1Point to structure their accounts in a way that facilitated Stokes's fraud. Initially, 1Point intended to establish accounts for each client under the client's tax identification number. But to circumvent burdensome "know your customer" rules, which require banks to verify the identities of their customers, Regions insisted that 1Point open the accounts in its own name and simply provide them titles referencing the account's corresponding client. In this manner, 1Point opened over 58 accounts with Regions—bearing account names such as "1Point FSA Metro Government Account"—in which it held client funds. Because the accounts bore 1Point's name, Stokes—owner and operator of 1Point—was able to transfer money among and out of the accounts, a capability that later allowed him to embezzle customer funds.

Between 2002 and 2006, Stokes stole large sums from these accounts. In furtherance of his criminal scheme, he (1) transferred money from client accounts to his account at Regions, (2) withdrew hundreds of thousands of dollars from the 1Point 401(k) account in the form of cashier's checks, (3) used client accounts to fund 1Point's operating expenses, and (4) transferred money between customer accounts to pay overdraft fees and conceal his theft. Stokes briefly moved the 1Point accounts to Fifth Third Bank in 2006, but the bank soon closed the accounts for improper activity. Regions failed to exercise the same vigilance.

For the most part, Regions behaved like an ordinary depositary bank. It facilitated 1Point's withdrawals and transfers, received over $50 million in deposits for plan accounts, and held plan assets. Regions also collected fees and analysis charges from 1Point's accounts, totaling more than $500,000 over the course of 1Point and

Regions' relationship. As a depositary bank, Regions was subject to various regulations—including provisions of the Bank Secrecy Act, 31 U.S.C. §§ 3513 *et seq.*—aimed at preventing money laundering. Among other things, these regulations required Regions to report large currency transactions, file suspicious-activity reports, verify the identities of those opening accounts, and maintain automated computer monitoring of accounts.

Regions failed to comply with these regulations. In 2004, the U.S. Financial Crimes Enforcement Network assessed a $10 million fine against Regions and its predecessor, AmSouth Bank, for their failure (1) to report suspicious activity in a timely manner, (2) to develop an anti-money laundering program and implement anti-money laundering policies, and (3) to respond to circumstances in which account holders used Regions bank accounts to further schemes involving embezzlement and fraud. Pointing to these failures in monitoring accounts and Stokes's unusual account activity, plaintiffs allege that Regions "knew or should have known" about Stokes's misconduct.

In 2006, Stokes and 1Point filed for bankruptcy protection, and plaintiffs then discovered Stokes's theft. In August 2007, the Trustee filed this case against Regions in bankruptcy court on behalf of the victimized plans for which he assumed fiduciary status on behalf of Stokes and 1Point. In February 2008, the district court withdrew the reference of the Trustee's case to the bankruptcy court.

The Trustee accuses Regions of failing to take action in the face of Stokes's obvious criminal scheme. He alleges that 1Point's transactions "triggered red flags" that should have apprised Regions of its duty to investigate the transactions. In his complaint, the Trustee points to a number of irregularities that alerted Regions to Stokes's theft—for example, commingling customer accounts and small, "odd dollar" withdrawals from customer accounts. Based on these irregularities, the Trustee argues, Regions "knew or should have known" about the misuse of the funds in 1Point's accounts. The Trustee's original complaint asserted ERISA claims against Regions, both in its capacity as a fiduciary and as a nonfiduciary, as well as state-law claims based on negligence and aiding and abetting.

Regions moved to dismiss these claims under Federal Rule of Civil Procedure 12(b)(6).  The district court granted the motion in part, finding that only the Trustee's negligence claims survived Regions' motion.  The court (1) found that ERISA provided the Trustee standing to sue on behalf of the defrauded plans, but that (2) Regions failed to qualify as an ERISA fiduciary; (3) dismissed the nonfiduciary claims against Regions; (4) found that ERISA preempted the Trustee's state-law claim that Regions aided and abetted Stokes's and 1Point's breach of fiduciary duty; and (5) allowed the Trustee's state-law negligence claim to proceed.

A month after the court's ruling, a number of 1Point's former clients, including EFS, Inc., brought suit against Regions.  EFS's factual allegations mirrored the Trustee's, and the district court consolidated the two lawsuits into one action.  After the consolidation, both EFS and the Trustee amended their complaints to include recklessness, unjust enrichment, and violation of the Tennessee Consumer Protection Act ("TCPA").  In addition, EFS brought several aiding-and-abetting claims.

Following plaintiffs' amendments, Regions moved to dismiss the claims under Federal Rule of Civil Procedure 12(c).  The district court granted the motion, finding that ERISA preempted the Trustee's remaining state-law claims against Regions.  For the same reason, the court dismissed all of EFS's claims against Regions, except several brought by plaintiffs suing on behalf of non-ERISA plans.

## II.

On appeal, the Trustee challenges the district court's 2008 dismissal of its ERISA claims under Federal Rule of Civil Procedure 12(b)(6); and both parties challenge the district court's 2010 grant of Regions' motion for judgment on the pleadings dismissing their state-law claims under Federal Rule of Civil Procedure 12(c).  We address these decisions in turn.

*A. Whether the District Court Properly Dismissed the Trustee's ERISA Claims*

The Trustee first challenges the district court's 2008 dismissal of his ERISA claims, arguing that the court erred in holding that Regions fails to qualify as an ERISA fiduciary.  Regions agrees with the court's conclusion on this point and offers an alternate ground for affirming the court's judgment:  the Trustee lacked standing to pursue claims on behalf of the defrauded plans.  We review a dismissal under 12(b)(6) de novo, construing the Trustee's complaint in the light most favorable to him and accepting the complaint's factual allegations as true.  *See Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 444 (6th Cir. 2012).

*1.  Standing*

We begin with the question whether the Trustee has standing to sue on behalf of the defrauded plans.  Regions contends that he does not, because the Trustee never served as a fiduciary to the plan beneficiaries and because the doctrines of in pari delicto and unclean hands bar suit.  We reject both arguments, and find that the Trustee enjoys standing to pursue his ERISA claims against Regions.

Citing *In re Cannon*, 277 F.3d 838 (6th Cir. 2002), Regions argues that the Trustee cannot recover funds for the benefit of plan participants.  The general rule is that a bankruptcy trustee can bring any suit that the debtor could have pursued.  *Cannon* carves out an exception to this rule, however, holding that a bankruptcy trustee lacks standing to bring a cause of action that does not belong to the debtor's estate.  *See id.* at 856; *cf. Begier v. IRS*, 496 U.S. 53, 59 (1990) ("[B]ecause the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'" (quoting 11 U.S.C. § 541(d))).  Likewise, Regions submits, the Trustee lacks standing to bring ERISA claims on behalf of the plans because the damages sought would benefit only the ERISA beneficiaries—not 1Point's estate.  *See* 29 U.S.C. § 1109(a) ("Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good *to such plan . . . .*" (emphasis added)).

But this argument ignores the unique role of a trustee acting as an ERISA fiduciary. The Trustee brings this suit in his role as an ERISA fiduciary, rather than his role as a trustee to the debtor's estate. This distinguishes the Trustee's situation from that of the bankruptcy trustee in *Cannon*. In *Cannon*, the assets that the debtor held in trust did not form part of the debtor's estate; for that reason, *Cannon*'s bankruptcy trustee lacked statutory authority to pursue claims that benefitted the trust beneficiaries. By contrast, the Trustee, acting as an ERISA fiduciary, holds such statutory authority—not because the ERISA plans represent part of the debtor's estate (they do not, because the plan assets are held in trust), but because, by virtue of the Trustee's control over ERISA-plan funds, ERISA confers the Trustee with additional duties and powers. *See* 29 U.S.C. § 1002(21)(A) ("[A] person is a fiduciary with respect to a plan to the extent . . . he exercises . . . any authority or control respecting management or disposition of its assets . . . ."). ERISA not only permits—but requires—a fiduciary to remedy the known wrongs of a cofiduciary. *See* 29 U.S.C. § 1105(a)(3) (imposing liability on fiduciaries for failure to exercise reasonable efforts to remedy known breaches of other fiduciaries); *id.* § 1132(a)(2) (permitting fiduciaries to bring a civil action under ERISA).

The Trustee's complaint easily establishes his ERISA-fiduciary status. Under ERISA, "a person is a fiduciary with respect to a plan to the extent (i) he exercises *any* discretionary authority or discretionary control respecting management of such plan or exercises *any* authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i) (emphases added). Regions does not dispute that 1Point served as a TPA for the plans at issue, or that Stokes and 1Point, as plan administrators, wielded control of the plan assets deposited with Regions. Further, the Trustee pleads that he acts as "successor fiduciary" for each of the ERISA plans for which 1Point or Stokes acted as fiduciaries; that he exercises discretionary control over assets belonging to the ERISA plans; that as fiduciary he must "make reasonable efforts" to remedy known breaches of other fiduciaries; and that he brings the claim under 29 U.S.C. § 1132(a)(2), a provision that permits "a participant, beneficiary or fiduciary" to bring

a civil action for ERISA violations.  Accepting these allegations, the Trustee falls within ERISA's definition of "fiduciary."  *See* 29 U.S.C. § 1002(21)(A).

The fact that the Trustee no longer controls the stolen assets does not disturb this conclusion.  Seizing on 29 U.S.C. § 1002(21)(A), Regions contends that even if the Trustee served as an ERISA fiduciary, he occupied fiduciary status only "to the extent" that he exercised control over plan assets.  Regions argues that the Trustee cannot control the funds that 1Point misappropriated,  and concludes on that basis that the Trustee fails to qualify as a fiduciary with respect to those funds.   At bottom, this argument amounts to a claim that the victim of a theft has no right to his stolen property because he no longer possesses the property.  We reject that conclusion, and find that the Trustee remains a fiduciary with respect to the victimized plans because he has sufficiently pleaded his authority to manage or dispose of all assets belonging to the plans, notwithstanding his lack of control over the particular funds that Stokes stole from plan accounts.

Regions' remaining two arguments fare no better.  First, Regions contends that the district court, rather than the Trustee, controls the ERISA plans' assets—a fact that the Trustee disputes.  Because we accept the Trustee's factual allegations as true, this argument fails. *See Carrier Corp.*, 673 F.3d at 444.

Second, Regions faults the Trustee for failing to specify which plans deposited their funds at Regions.  But at this stage, the Trustee's pleadings need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation and citation omitted).  For the purposes of pleading standing, we find it sufficient that the Trustee describes the allegedly victimized plans, avers that he acts as successor fiduciary "for each of the plans," and explains the legal basis for his fiduciary relationship: "exercis[ing] discretionary control over assets of plans subject to ERISA."

*2. Whether the Doctrines of In Pari Delicto and Unclean Hands Bar the Trustee's Claims*

Regions further argues that the equitable doctrines of in pari delicto and unclean hands—two doctrines that prevent culpable plaintiffs from bringing suit—bar the Trustee's claims. *See, e.g.*, *Pinter v. Dahl*, 486 U.S. 622, 632 (1988). These defenses may have barred the claims of Stokes and 1Point, had those two brought the claims themselves. Because the Trustee steps into the shoes of Stokes and 1Point, Regions argues, the doctrines should bar his claims as well.

Again, Regions misunderstands the Trustee's role. The Trustee sues as an ERISA fiduciary representing the plans' interests, rather than as a bankruptcy trustee suing to enlarge the debtor's estate. Any funds that the Trustee recovers as an ERISA fiduciary inure to the ERISA plans' benefit, rather than to the benefit of the estate's creditors. For the purposes of the Trustee's ERISA claim, therefore, he "steps into the shoes" of the plans, rather than those of the criminal debtors. Though the doctrines may bar suit where a bankruptcy trustee seeks to enlarge the estate of a wrongdoing debtor, this case presents a different scenario: the Trustee's claims exist between the victims of the wrongdoing the plans and an alleged wrongdoer (Regions).

A review of the equitable purposes behind these defenses bolsters our conclusion that they do not apply. As to equitable doctrines, courts limit the application of in pari delicto and unclean hands to the equitable purposes that they serve. *See Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306-07 (1985). As the *Bateman Eichler* Court observed, the common-law doctrine of in pari delicto serves the dual purposes of (1) preventing courts from wasting their resources "mediating disputes among wrongdoers" and (2) "deterring illegality." 472 U.S. at 306.

Applying the doctrine here serves neither purpose. First, all concede that the ERISA plans are innocent of any wrongdoing. Second, any recovery would benefit only the defrauded plans, such that barring the claims serves no deterring function. *See* 29 U.S.C. § 1104(a)(1) (requiring an ERISA fiduciary to discharge duties "with respect to a plan" for the exclusive purpose of providing benefits to plan participants and

beneficiaries).  Third, because the Trustee brings the ERISA claim in his capacity as an ERISA fiduciary, rather than as a bankruptcy trustee, he shares no blame for the debtor's wrongdoings unless he fails to "make[] reasonable efforts under the circumstances to remedy" any known breaches of duty.  *See* 29 U.S.C. § 1105(a)(3); *see also id.* § 1109(b) ("No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.").  Accordingly, we find that the Trustee has standing to bring an ERISA claim on behalf of the plans described in his complaint.

*3.  Whether Regions Bank Qualifies as an ERISA Fiduciary*

Next, the Trustee challenges the district court's conclusion that Regions did not serve as a fiduciary to the victim plans.  This question stands paramount, because ERISA permits a plaintiff to obtain equitable relief *and* recover damages from fiduciaries who breach their duties.  *See* 29 U.S.C. §§ 1109, 1132(a)(2).  Against *non*fiduciaries, however, only "appropriate equitable relief" is available.  *See* 29 U.S.C. § 1132(a)(3). Because, as the district court found, the Trustee seeks only damages, the fate of his ERISA claims turns on whether Regions qualifies as a fiduciary.

We review a district court's determination regarding ERISA-fiduciary status de novo.  *Hamilton v. Carell*, 243 F.3d 992, 997 (6th Cir. 2001); *Briscoe v. Fine*, 444 F.3d 478, 486 (6th Cir. 2006).  Where the parties do not dispute the underlying facts, "a party's status as an ERISA fiduciary is purely a question of law."  *Hamilton*, 243 F.3d at 997.  Discerning no factual dispute, we reject the Trustee's claim that the district court's ruling was premature.

We begin with ERISA's description of those who qualify as fiduciaries:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . .

29 U.S.C. § 1002(21)(A).  In the Trustee's view, Regions qualified as a fiduciary by exerting "authority or control respecting management of [plan] assets."  *Id.*

Attempting to demonstrate Regions' fiduciary status, the Trustee marshals a number of allegations from his complaint purportedly describing Regions' "authority or control" over the ERISA-plan accounts. The allegations fall into five categories: that Regions (1) knew that 1Point's accounts held plan assets; (2) should have recognized that 1Point managed these accounts differently than typical third-party administrators of employee-benefits plans; (3) failed to comply with banking regulations that would have uncovered Stokes's scheme; (4) advised 1Point to structure its accounts in a way that circumvented "know your customer" rules; and (5) withdrew over $500,000 in "fees and analysis charges" from the plan funds.

The first three allegations miss the mark. Section 1002(21)(A)(i) directs us to focus on the extent of Regions' control over plan assets, rather than on what Regions knew or should have known. And though the Trustee claims that Regions "exercised authority or control over the management or disposition of funds in its custody," the factual allegations of his complaint fail to support that conclusion. In general, the complaint alleges that Regions maintained accounts for 1Point, received deposits to those accounts, and permitted Stokes and 1Point to transfer and withdraw money from these accounts. Stokes and 1Point maintained the accounts and directed all account activity. Regions merely held the funds on deposit. Custody of plan assets alone cannot establish control sufficient to confer fiduciary status. *See, e.g.*, *Briscoe*, 444 F.3d at 494 ("Our reading of ERISA's statutory definition will not extend fiduciary status to every person who exercises mere possession, or custody over the plans' assets." (internal quotation marks and citation omitted)); *Chao v. Day*, 436 F.3d 234, 237 (D.C. Cir. 2006).

The same goes for Regions' advising 1Point and Stokes as to how it ought to structure the banking aspects of its business. As with mere custody, advising on account structuring offers no foothold for labeling Regions a fiduciary. All control of the accounts remained with 1Point and Stokes.

That leaves the proposition that Regions' withdrawal of about a half million dollars in fees from 1Point plan accounts demonstrates control over plan assets. For

support, the Trustee points to our decisions in *Briscoe* and *Smith v. Provident Bank*, 170 F.3d 609 (6th Cir. 1999), cases where we found ERISA-fiduciary status applicable to a plan custodian exerting unilateral control over plan assets. In *Briscoe*, the TPA of a company's healthcare plan canceled its contract after financial difficulties rendered the company unable to support the plan. 444 F.3d at 484. Upon terminating its relationship with the company, the TPA wrote a check remitting the balance of the funds in the plan's account to the company—but retained for itself an "administrative fee" of several thousand dollars. *Id.* at 484, 490. The court held that the "unilateral disposition of funds held in an account over which it exerted control ma[de] [the TPA] a fiduciary to the extent that it exercised such control upon the termination of its relationship." *Id.* at 490; *see also Briscoe v. Preferred Health Plan, Inc.*, 578 F.3d 481, 485-87 (6th Cir. 2009) (limiting the defendant's liability in *Briscoe* to funds over which it exercised control *after* terminating its agreement with the plaintiff). Similarly, in *Smith* a bank transferred stock from the account of an ERISA plan without authorization after the plaintiff removed the bank as trustee. 170 F.3d at 612-13.

Neither case supports the Trustee's position here because both address the control of plan assets after termination of the contractual relationship with the plans. Here, the Trustee alleges only that "[Regions] regularly withdrew its fees and analysis charges from the trust funds it held." Nothing suggests that Regions did anything other than collect contractually owed fees. Unlike the *Briscoe* plaintiff, the Trustee does not allege that Regions unilaterally exercised any power to pay itself fees. Elsewhere in his complaint, the Trustee challenges the amount of the fees as "unreasonable" and argues that the fees constitute unjust enrichment because Regions received them as compensation for its complicity in Stokes's fraud. Neither contention undermines the conclusion that Regions collected only routine fees authorized by its depositary agreement with 1Point.

The Trustee fails to proffer—nor have we found—any case extending fiduciary status to a bank under these circumstances. Construing the allegations in the light most favorable to the Trustee, Regions' withdrawal of routine contractual fees constitutes no

more an exercise of control than any other account holder's request effectuated by a depositary bank. Such transactions amount to "control respecting management or disposition of [plan] assets," 29 U.S.C. § 1002(21)(A), in only the hollowest sense of "control." *See Pipefitters Local 636 v. Blue Cross & Blue Shield of Mich.*, 213 F. App'x 473, 477 (6th Cir. 2007) (holding that in order to overcome a motion to dismiss, a plaintiff must allege that the defendant "exercised any authority or control over plan assets, and that it performed more than a mere ministerial or contractually compelled function in assessing [a] subsidy fee"); *Seaway Food Town, Inc. v. Medical Mut. of Ohio*, 347 F.3d 610, 619 (6th Cir. 2003). We reject the Trustee's argument that Regions' collection of fees rendered it subject to liability as an ERISA fiduciary.

*B. Whether the District Court Properly Dismissed Plaintiffs' State-Law Claims*

Both the Trustee and EFS appeal the district court's dismissal of their state-law claims against Regions, which alleged (1) negligence and recklessness, (2) unjust enrichment, and (3) violation of Tennessee's Consumer Protection Act.

These claims rest on a common set of allegations. Both plaintiffs allege that Regions violated a "duty to monitor the accounts of 1Point." They also accuse Regions of violating its duty of reasonable care by failing to comply with various banking regulations, arguing that proper compliance with these regulations would have uncovered Stokes's fraud.

Plaintiffs also accuse Regions of acting with greater culpability than mere negligence. Both EFS and the Trustee allege that Regions *knew* that Stokes withdrew money from fiduciary accounts for his personal benefit and nevertheless permitted the illegal withdrawals. EFS's complaint goes even further, alleging that Regions "knowingly assisted 1Point Solutions in retaining clients it was defrauding."

In dismissing plaintiffs' state-law claims, the district court found that Tennessee's Uniform Fiduciaries Act ("UFA") limited plaintiffs' claims to allegations of knowing or bad-faith conduct and that ERISA preempted any allegation that survived the UFA's bar. On appeal, plaintiffs challenge only the court's conclusion regarding

ERISA preemption.  We review de novo a district court's grant of judgment on the pleadings under Rule 12(c), as well as a court's conclusion that a federal statute preempts a state-law claim.  *See Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.* (*PONI*), 399 F.3d 692, 697 (6th Cir. 2005); *Nester v. Allegiance Healthcare Corp.*, 315 F.3d 610, 613 (6th Cir. 2003).

The UFA shields depositary banks from liability arising from the actions of a fiduciary depositor, unless the bank acts with "actual knowledge" of a breach or "knowledge of such facts that its action . . . amounts to bad faith."  Tenn. Code Ann. §§ 35-2-107, -109; *see C-Wood Lumber Co. v. Wayne Cnty. Bank*, 233 S.W.3d 263, 274 (Tenn. Ct. App. 2007).  A claim that Regions acted in "bad faith," then, turns on showing that it knew facts strongly suggesting that 1Point and Stokes breached their fiduciary duties.  *See C-Wood Lumber*, 233 S.W.3d at 284 (construing "bad faith" to mean "acting dishonestly").  After finding that the UFA displaced plaintiffs' negligence claims, the district court held that only plaintiffs' allegations of "knowing" or "bad faith" conduct survived.  Plaintiffs do not quarrel with this conclusion.

What survives the UFA, ERISA preempts.  Because ERISA provides a remedy against nonfiduciaries who knowingly participate in a fiduciary's violation of ERISA, *see* 29 U.S.C. § 1132(a)(3), the district court found that ERISA preempted any allegations of "knowing" or "bad faith" conduct that escaped the UFA's bar.  We agree.

ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" governed by ERISA.  29 U.S.C § 1144(a).  "Both the Supreme Court and this court have emphasized the broad scope of ERISA's 'expansive pre-emption provision[ ].'"  *Briscoe*, 444 F.3d at 497 (alteration in original) (quoting *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 208 (2004)); *see also Cromwell v. Equicor-Equitable HCA Corp.,* 944 F.2d 1272, 1276 (6th Cir. 1991) (noting "that virtually all state law claims relating to an employee benefit plan are preempted by ERISA").

To guide courts in determining whether a claim "relates to" a benefit plan, the Sixth Circuit has identified three classes of state-law claims subject to ERISA

preemption: claims based on "state laws that (1) mandate employee benefit structures or their administration; (2) provide alternative enforcement mechanisms; or (3) bind employers or plan administrators to particular choices or preclude uniform administrative practice, thereby functioning as a regulation of an ERISA plan itself." *Briscoe*, 444 F.3d at 497 (quoting *PONI,* 399 F.3d at 698). Plaintiffs' state-law claims fall within the second category.

Again, *Briscoe* guides our reasoning. In *Briscoe*, the court held that ERISA preempted state-law claims of fraud, misrepresentation, and concealment based on a nonfiduciary defendant's alleged failure to disclose a healthcare plan's financial condition. 444 F.3d at 498. The court reasoned that "[a]ny duty to disclose the financial condition of the plan that [the defendants] might have owed to the plan beneficiaries arose not out of an independent source of law, but out of the existence and nature of the plan itself." *Id.* at 499. Accordingly, the court determined that the claims served as an "alternative enforcement mechanism" and concluded that ERISA preempted the claims. *Id.* at 500 (quoting *PONI*, 399 F.3d at 698).

ERISA forecloses plaintiffs' state-law claims for the same reason. As the defendant's liability did in *Briscoe*, Regions' liability turns on the existence of the plans and the substance of ERISA. Key to our conclusion is the district court's unchallenged determination that the UFA bars plaintiffs' claims to the extent that they rest on mere negligence. What remains of plaintiffs' claims are allegations that Regions (1) acted with knowledge of Stokes's and 1Point's breach of fiduciary duty or (2) acted in bad faith because it knew facts obviously suggestive of their breach. Proving these allegations depends on a showing that Stokes and 1Point breached their fiduciary duty and requires an examination of Regions' knowledge of the breach. Like the claims in *Briscoe*, these claims do not arise from an independent legal duty; rather, they derive from the ERISA violations committed by Stokes and 1Point. By seeking to impose liability on Regions for knowingly permitting Stokes and 1Point to breach their fiduciary duties, plaintiffs' state-law claims seek an "alternative enforcement mechanism" for the legal duties imposed under ERISA.

In the absence of the UFA, we may have reached a different conclusion. ERISA does not preempt garden-variety claims against nonfiduciaries providing professional services to an ERISA plan based on breaches of professional responsibility. *See, e.g.*, *PONI*, 399 F.3d at 703 (holding that a negligent misrepresentation claim against a "non-fiduciary service provider" does not implicate ERISA, as it does not require a court to evaluate whether the service provider violated the terms of an ERISA-governed plan). But the UFA bars plaintiffs' claims to the extent they rest on mere negligence, and the remaining allegations stem from Stokes's and 1Point's ERISA-imposed duties, and not from a legal duty independent of ERISA.

That ERISA provides its own, limited remedy against Regions for its alleged conduct buttresses this conclusion. Under ERISA, a plan "participant, beneficiary, or fiduciary" may seek an injunction against a nonfiduciary who knowingly participates in a fiduciary's violation of ERISA. *See* 29 U.S.C. § 1132(a)(3) (authorizing civil actions for "appropriate equitable relief" to redress violations of ERISA Title I); *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 245 (2000) (holding that § 1132(a)(3) authorizes suits against nonfiduciaries). There is nevertheless powerful incentive to recast a potential ERISA claim against a nonfiduciary as a state-law claim, because ERISA holds only *fiduciaries* personally liable.

Plaintiffs' unjust-enrichment claims exemplify such recasting. Previously, the Trustee sought disgorgement of the bank fees—an equitable remedy—from Regions under ERISA's civil enforcement provision. *See* 29 U.S.C. § 1132(a)(3). The district court dismissed the claim, finding that there were no "specifically identifiable" funds in Regions' possession, and that equitable relief was therefore unavailable. The claim then reappeared in the Trustee's amended complaints, transmogrified into a state-law claim for unjust enrichment. Peering through the state-law disguise, the district court rejected the claim as a "reframing of the previously dismissed ERISA claim."

Against nonfiduciaries, ERISA confines plaintiffs to equitable relief. *See* 29 U.S.C. § 1132(a)(3). By styling their ERISA claim as a state-law claim, the plaintiffs seek to hold Regions—a *nonfiduciary*—personally liable. The Supreme Court has

rejected such attempts to supplement the remedies available under ERISA: "[A]ny state-law cause of action that duplicates, supplements or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Aetna,* 542 U.S. at 209.

Plaintiffs complain that this ruling leaves them without a remedy against Regions. This might be true, but "the availability of a remedy under ERISA is not relevant to the preemption analysis." *David P. Coldesina, D.D.S., P.C. v. Estate of Simper*, 407 F.3d 1126, 1139 (10th Cir. 2005). "As the Supreme Court recently reiterated, ERISA's remedial scheme evidences Congress's policy choices and intent to provide only the remedies it specified, and this court is not in a position to second-guess Congress simply because the facts of a particular case might be sympathetic." *Id.* (citing *Aetna,* 542 U.S. at 209).

Because plaintiffs seek damages, there is simply no space between the UFA's bar and ERISA's preemptive force through which their state-law claims can pass. To the extent that plaintiffs' claims stem from Regions' negligence, the UFA bars them; to the extent they arise from Regions' knowledge of or bad-faith acquiescence in Stokes' scheme, ERISA preempts them.

### III.

For the above reasons, we AFFIRM the district court's judgments.

_____

**DISSENT**

_____

MERRITT, Circuit Judge, dissenting. The law on ERISA preemption is in a state of disarray, to say the least. *See, e.g.*, *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) ("prior attempt to construe the phrase 'relate to' does not give us much help drawing the line"); *California Div. of Labor Standards Enforcement v. Dillingham*, 519 U.S. 316, 335 (1997) (Scalia concurring) ("applying the 'relate to' provision according to its terms was a project doomed to failure . . . everything is related to everything else"); *AETNA Health, Inc., v. Davila*, 542 U.S. 200, 222 (2004) (Ginsburg concurring) ("I join the rising judicial chorus urging that Congress and [this] Court revisit what is an unjust and increasingly tangled ERISA regime"); Langbein, "What ERISA Means By 'Equitable,'" 103 Colum. L. Rev. 1317 (2003). I find no similar cases preempting banking laws protecting from loss the deposits of customers, including ERISA customers, or regulating bank fees charged to such customers. To the contrary, the Ninth Circuit concluded that Arizona common law was not preempted in an action against Citibank "as a service provider offering nonfiduciary custodial services" to ERISA participants. *Arizona State Carpenters' Pension Trust Fund v. Citibank*, 125 F.3d 715, 723 (9th Cir. 1997).

The ERISA clause on preemption barring remedies that "relate to any employee benefit plan" is so broad and so lacking in specific meaning and application that we act basically as a common law court in creating its meaning in individual cases. Therefore, we should state the policies we are implementing and the congressional purpose behind the statute that we are trying to serve. The policy on preemption found in many ERISA cases emphasizes "the normal presumption *against* preemption" when we are dealing with state "laws of general application," *De Buono v. NYSA-ILA Medical and Clinical Services Fund*, 520 U.S. 806, 811-14 (1997). Here we are dealing with common law principles, equitable unjust enrichment principles, and a Tennessee statute of general application.

The primary purpose of ERISA is to protect the individual who has a pension or health plan from certain kinds of losses, *i.e.*, "to increase the likelihood that participants . . . will receive their full benefits."  29 U.S.C. § 1001b(c).  It is not to protect a depository bank from general state laws concerning malfeasance in connection with the bank's handling of the bank accounts of participants.  In this case, we have no idea whether the bank is liable for misfeasance under state law.  The case against the bank has not been tried or the facts proved or the state law analyzed and applied.  I dissent because our court is using a doctrine of ERISA preemption not to protect the ERISA participants but to shield the bank from any investigation of the claims against it.  The court has given the bank an immunity from general state law liability no matter what its conduct, as though the bank has the status of a sovereign.  Banks are important institutions for our society and perform many valuable services, but they are not sovereign and not entitled to be exempt from general laws.

Having found that Regions, acting only as a depository bank holding cash deposits, does not meet the definition of an ERISA "fiduciary" under 29 U.S.C. § 1002(21)(A) — a decision with which I agree — the court then bars all state law claims and appears to leave the plan participants without any legal remedy whatever, common law or otherwise, when a depository bank causes a loss of ERISA participants' deposits through reckless or willfully blind conduct or unjust enrichment.

The dismissals in both the Trustee's and the participants' cases were on the pleadings under Fed. R. Civ. P. § 12(c) and based on the "doctrine of ERISA preemption."  It may be that Regions is not liable for any misfeasance, but we should not decide the case preemptively without even looking at the facts and law regarding the bank's possession and disposition of the participants' deposits.  We have bankruptcy and supplementary jurisdiction of the Trustee's claims, and diversity jurisdiction of the investors' claims, and therefore the normal duty to enforce state law.

Our court's idea that state law remedies fail because they add or provide only "an alternative enforcement mechanism" is strange, indeed, when the federal ERISA law provides no "enforcement mechanism" whatever for damages against the misfeasance

of a depository bank that is not a fiduciary. There is nothing, no ERISA cause of action for damages for the state claims to be "alternative" to. There is no ERISA purpose or policy served by withdrawing the protection of state laws of general application. What is the possible harm caused by the enforcement of state laws providing damages if a bank recklessly allows its depositors' money to be embezzled by a fiduciary?

Plaintiff's unjust enrichment claim serves as a good example of the confusion engendered by the preemption defense. We do not know whether the bank withdrew $500,000 from the plaintiffs' accounts properly or in cahoots with Stokes or in willful blindness to his conduct. Should the bank have to restore some or all of the money removed by the bank from the participants' accounts? The general common law of unjust enrichment goes back three centuries to the Chancery Court in 17th Century England. The principles underlying unjust enrichment do not interfere with ERISA. Tennessee ostensibly still goes by the old law of unjust enrichment explained by Lord Mansfield in *Moses v. MacFerlan*, 2 Burr. 1005, 1012, 97 Eng. Rep. 676, 681 (K.B. 1760): "In one word, the gist of this kind of action is, that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money." I have no idea whether plaintiffs are entitled to restitution of the fees, or some part of them, charged by the bank against their accounts because the record does not reflect specifically what the facts are, nor has the Tennessee law as it applies in this case been analyzed. But the bank is not entitled to prevail under the doctrine of ERISA preemption without any analysis of Tennessee's law of unjust enrichment. The fact that §§ 1132(a) and (c) allows the Secretary of Labor to seek an injunction against violations of a provision of ERISA should not preempt or displace the law of unjust enrichment requiring a wrongdoer to restore benefits wrongfully obtained. If the defendant is enriched as a result of a "known risk that the conduct in question violates" plaintiff's rights, the plaintiff may pursue an accounting. *See* RESTATEMENT (THIRD) OF RESTITUTION § 51 (2011).

To foreclose unjust enrichment would leave those whom Congress intended to protect worse off than before ERISA was enacted. ERISA does not require abrogation

of the law of unjust enrichment under these circumstances, and I would not adopt a construction of preemption that perversely deprives the participants of rights they previously possessed and that Congress intended to further protect when it federalized the administration of pension and employee benefit plans in ERISA.