**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-1188

KIMBERLY P. GORDON,

Plaintiff - Appellant,

v.

CIGNA CORPORATION; LIFE INSURANCE COMPANY OF NORTH
AMERICA,

Defendants - Appellees,

and

UCG HOLDINGS LP; OIL PRICE INFORMATION SERVICES, LLC,

Defendants.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.
Roger W. Titus, Senior District Judge. (8:16-cv-00238-RWT)

Argued: January 24, 2018                    Decided: May 15, 2018

Before AGEE, WYNN, and THACKER, Circuit Judges.

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge Agee
and Judge Thacker joined.

**ARGUED:** Jonathan Tycko, TYCKO & ZAVAREEI LLP, Washington, D.C., for
Appellant. Christopher Joseph Boran, MORGAN, LEWIS & BOCKIUS, LLP, Chicago,

Illinois, for Appellees. **ON BRIEF:** Anna C. Haac, TYCKO & ZAVAREEI LLP, Washington, D.C.; Daniel S. Kozma, LAW OFFICE OF DANIEL S. KOZMA, Washington, D.C.; James E. Miller, Kolin C. Tang, SHEPHERD FINKELMAN MILLER & SHAH, LLP, Chester, Connecticut, for Appellant. Jeremy P. Blumenfeld, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania, for Appellees.

———————————

WYNN, Circuit Judge:

Steven Gordon worked for Oil Price Information Services, Inc. and paid premiums on life insurance policies that totaled $300,000 in coverage. But when Steven Gordon died in January 2014, his insurer, The Life Insurance Company of North America ("LINA"), paid Steven's wife and beneficiary, Kimberly Gordon, only $150,000. The reason, LINA claimed, was because Steven Gordon had only been approved for $150,000 in coverage—not for the full $300,000 in coverage he had been paying for. When Kimberly Gordon sued for the difference between the two amounts, the district court granted summary judgment in favor of the insurance company.

The district court found that the errors leading to Steven Gordon's reduced coverage resulted from mistakes by his employer, which administered the life insurance plan, not the insurance company. Thus, the insurance company did not breach any fiduciary duty it may have had under the Employee Retirement Income Security Act of 1974 ("ERISA"), nor did it knowingly participate in a breach of trust by another fiduciary. The district court also found that discovery would not lead to any information that would change its conclusion, so the court granted summary judgment before either party conducted discovery. Kimberly Gordon, on behalf of Steven Gordon's estate, now appeals the district court's decision. We affirm.

I.

A.

During the time of Steven Gordon's employment, Oil Price Information Services was a subsidiary of UCG Holdings, LP (collectively referred to as "UCG," unless otherwise specified). UCG employees were eligible to participate in the company's group life insurance plan (the "Plan"). The policies provided by UCG were underwritten by the Defendant Life Insurance Company of North America ("LINA"), a wholly-owned subsidiary of Defendant CIGNA Corporation (collectively referred to as "CIGNA Defendants"). Every employee at UCG received $50,000 in basic group life insurance, for which UCG paid all premiums at no cost to the employee. Employees could also elect to purchase additional coverage and have the associated premiums automatically deducted from their pay.

The Plan documents allocate responsibilities between UCG and LINA. The "Administration Manual" provides that the Plan is self-administered, meaning that UCG, as the employer, was "responsible for day-to-day program administration." J.A. 100, 111; *see also* J.A. 98 (listing UCG as the "Plan Administrator"). In that role, UCG's responsibilities included, *inter alia*, "[v]erifying employee eligibility for benefits," "[p]roviding enrollment materials to employees," "[m]aking sure employees enroll accurately and on time," "[h]andling changes to benefit elections," and "[c]ompleting premium payment procedures." J.A. 103. UCG also was responsible for providing accurate record-keeping of "[i]ndividual-level information (such as beneficiary designations, applications, coverage change forms, and assignments)," as well as for providing employees with accurate and timely information about their benefits. J.A. 104. The manual also described UCG's fiduciary responsibilities under ERISA:

4

*ERISA places certain responsibilities on fiduciaries, who are the persons responsible for managing the employee benefit plan.* In general, fiduciaries must act prudently, must follow the terms of the written plan documents (one of which is your group insurance policy), must act solely in the interests of participants and beneficiaries, and must refrain from certain conflicts of interest and other prohibited transactions. *ERISA plans are managed by a fiduciary known as the Plan Administrator, which is most often the employer.* . . .

J.A. 103 (emphasis added).

According to the manual, UCG's responsibilities also included "Self Billing." J.A. 111. This structure meant that UCG—not LINA—maintained all employee-level coverage data, calculated employee premiums, and collected those premiums via payroll deduction. Then, at the end of each month, UCG prepared and submitted an invoice, along with a single, bulk premium to LINA. The bulk premium reflected the total monthly premiums for both basic and supplemental life insurance coverage under the Plan. The premium did not identify the names of individual policy-holders for whom payment was being made, nor did UCG list the amount being paid for any specific policy-holder.

Under its authority as Plan Administrator, UCG executed an "Appointment of Claim Fiduciary" form, in which it appointed LINA as "the designated fiduciary for the review of claims for benefits under the Plan." J.A. 98. In this role, LINA was "responsible for adjudicating claims for benefits under the Plan, and for deciding any appeals of adverse claim determinations." *Id.* LINA also had "the authority, in its discretion, to interpret the terms of the Plan . . . [and] to decide questions of eligibility for coverage or benefits under the Plan." *Id.* However, notwithstanding LINA's role as a

5

fiduciary with respect to *claims* adjudication, the form explicitly stated that it "does not authorize [the] Claim Fiduciary any fiduciary responsibility with respect to the *administration* of the Plan except as provided" in the Claim Fiduciary form. *Id.* (emphasis added).

B.

Steven Gordon began work with UCG in late March 2013. At that time, he enrolled in the Plan and attempted to obtain $250,000 in supplemental coverage. Accordingly, UCG deducted approximately $210 in monthly premiums—the amount associated with that level of coverage—from Steven Gordon's pay during his employment at UCG. The amount deducted totaled just over $1,260.[1]

By July 2013, Steven Gordon had become seriously ill and was hospitalized multiple times. On January 27, 2014—less than a year after he began working for UCG—Steven Gordon passed away. After Steven's death, Kimberly Gordon (the beneficiary of his life insurance policy), filed a claim with LINA seeking a payment of $300,000 (the $50,000 in basic group life insurance provided by UCG, as well as the $250,000 in supplemental coverage paid for by her late husband). But LINA approved the claim for only $150,000. The reason for the discrepancy stemmed from some

---

[1] UCG acknowledges that the amount withdrawn from Steven Gordon's pay was not the correct premium for $250,000 in supplemental coverage, because Steven Gordon's birthdate was incorrectly entered into the system, thereby artificially inflating his premiums. This error, however, has no bearing on the outcome of this appeal.

6

technicalities in the policy requirements and UCG's failure to correctly account for those nuances.

Under the terms of the Plan, employees who elected supplemental coverage had a "Guaranteed Issue amount"—that is, the amount of coverage the insurance company agreed to provide "without requiring the participant to submit medical evidence for approval." J.A. 205. The guaranteed issue amount under the Plan was $100,000 in supplemental coverage (for a total of $150,000 when combined with the $50,000 of basic group life insurance provided by UCG). For anything more than $100,000 in supplemental coverage, however, an employee needed to submit further information to verify insurability. According to the CIGNA Defendants' records, they never received that additional required information from Steven Gordon, so he was never approved for $250,000 in supplemental insurance. For that reason, the CIGNA Defendants agreed to pay Kimberly Gordon only $150,000—that is, the $50,000 of coverage paid for by UCG and the $100,000 in supplemental coverage for which Steven Gordon was eligible without submitting any medical evidence.

Kimberly Gordon asked the CIGNA Defendants to reconsider their decision, but they refused to alter their conclusions. She also sought answers from UCG. In a letter to Kimberly Gordon's counsel, UCG explained that when Steven Gordon had started employment with UCG, he had been given an "Enrollment Guide" discussing the position's insurance benefits. J.A. 264. This guide stated that, "[f]or any amount [of supplemental insurance] over $100,000, you must provide evidence of insurability." J.A. 230. Because Steven Gordon never submitted that evidence, he was never approved by

7

LINA for supplemental coverage above the guaranteed amount. UCG's letter further confirmed that the Plan operated in practice as it was described in the Plan documents. In particular, UCG described the self-billing format, in which "[n]o specific employee information [wa]s forwarded to CIGNA, only employee count, volume, and [total] premium amount." J.A. 265. Admitting that this process led to errors in Steven Gordon's case, UCG offered to refund Kimberly Gordon the excess premiums deducted from her late husband's pay. Instead, Kimberly Gordon filed this lawsuit.

The suit brought claims not only on behalf of Kimberly Gordon but also on behalf of a putative class. The proposed class included "[a]ll current and former employees of any company that is or has been a subscriber to the Group Policy, or any other similar policy issued or administered by the CIGNA Defendants, who paid premiums for Supplemental Life Insurance above the Guaranteed Issue Amount, but for whom the CIGNA Defendants do not have an 'Evidence of Insurability application.'" J.A. 24. As defendants in the suit, Kimberly Gordon listed UCG, LINA, and CIGNA.

The Complaint claimed the defendants were liable in two ways. Count I alleged that all the defendants were fiduciaries under ERISA, 29 U.S.C. § 1001 *et seq*, and that all the defendants breached their fiduciary duties by failing to notify Steven Gordon that he needed to submit additional evidence of insurability—while simultaneously collecting premiums for unapproved coverage. In the alternative, Count II alleged that if any defendant was *not* an ERISA fiduciary, then that defendant was still liable for knowingly participating in a breach of trust. Several months after the Complaint was filed—and

8

before any discovery was conducted—the CIGNA Defendants moved for summary judgment, and UCG moved to deny class certification.

On July 28, 2016, the district court held a hearing on both motions. During the hearing, counsel for the CIGNA Defendants argued that summary judgment was warranted because, under the terms of the Plan and governing law, neither LINA nor CIGNA was an ERISA fiduciary with respect to the particular conduct at issue, and neither defendant was aware of the errors that led to Steven Gordon paying excess premiums. In opposition, Kimberly Gordon argued that there was a genuine dispute of material fact as to whether the CIGNA Defendants were ERISA fiduciaries and that summary judgment was premature because she had not yet conducted any discovery.

The district court granted the CIGNA Defendants' motion for summary judgment, and denied UCG's motion to deny class certification. First, the district court concluded that CIGNA was an improper party because CIGNA was only a "holding company" that licensed its trademarks to appear on various products issued by its subsidiaries; in other words, CIGNA "didn't have any role under the plan documents." J.A. 407. Next, turning to Gordon's breach of fiduciary duty claim, the district court concluded that LINA had not breached any such duty. Relying on Plan documents, UCG's written concessions to Kimberly Gordon, and affidavits submitted by LINA, the district court reasoned that LINA's role "was indisputably that of claims administration; whereas, the administrative role for enrollment and getting people set up in the plan . . . was placed on [UCG]." J.A. 406. As such, Gordon's failure to submit the required evidence of insurability was "a slipup" by UCG, not by LINA. J.A. 407. The district court also

9

granted summary judgment on Count II, which claimed that all non-fiduciaries knowingly participated in a breach of trust. The district court found that such a claim could not stand because there was no evidence LINA knew of any breach by a fiduciary; rather, the "unrefuted" evidence showed "that the first time . . . LINA knew about the foul-up in collecting the premiums inappropriately . . . was when they got a claim [from Kimberly Gordon]." J.A. 411. Accordingly, the district court granted summary judgment to the CIGNA Defendants on both counts. The court, however, denied UCG's motion to quash class certification as "premature," J.A. 420, which led UCG to settle with Kimberly Gordon shortly after the motion was denied.

With UCG removed from the suit, Kimberly Gordon timely appealed the district court's grant of summary judgment in favor of the CIGNA Defendants. On appeal, Kimberly Gordon claims the district court erred in three ways: (1) granting summary judgment on both counts of the Complaint; (2) finding that CIGNA was an improper party; and (3) refusing to allow discovery prior to granting summary judgment. We address each argument below.

## II.

We review a district court's grant of summary judgment de novo. *Scinto v. Stansberry*, 841 F.3d 219, 227 (4th Cir. 2016). Summary judgement is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether that standard is met, we must "construe the evidence in the light most favorable to [the

10

non-movant] and draw all reasonable inferences in [its] favor." *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 283 (4th Cir. 2004) (en banc).

A.

Count I of Kimberly Gordon's Complaint alleges that the CIGNA Defendants breached their fiduciary duty under ERISA toward the Gordons and the potential class. The CIGNA Defendants, on the other hand, counter that they owed no fiduciary duty in regards to soliciting and receiving supporting materials for coverage beyond the guaranteed issue amount. We agree with the CIGNA Defendants.

As relevant here, ERISA provides that "a person is a fiduciary with respect to a plan to the extent":

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or

> (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). The answer to whether the CIGNA Defendants constitute fiduciaries for purposes of the claims at issue here turns on these definitions.

Kimberly Gordon's first argument focuses on the latter portion of subsection (i): a fiduciary "exercises any authority or control respecting management or disposition of [plan] assets." *Id.* Kimberly Gordon contends that because the bulk premium payments received by LINA from UCG were "assets" of the Plan and because LINA exercised "authority or control" over the "management or disposition" of those assets, LINA (and its parent, CIGNA) were fiduciaries under subsection (i). *Id.*

11

To evaluate the merit of this argument, we first assess whether the bulk premiums paid to LINA were Plan "assets," as ERISA uses that term. The statute does not provide a definition of what constitutes a plan asset. But the statute does list some important exclusions of what are *not* plan assets. Relevant here, "[i]n the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer." 29 U.S.C. § 1101(b)(2). Accordingly, we must determine whether the Plan is a "guaranteed benefit policy" such that only the policy itself is a Plan asset.

ERISA defines a "guaranteed benefit policy" as "an insurance policy or contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer." 29 U.S.C. § 1101(b)(2)(B). To determine whether a policy falls within this category, we examine "each component of the contract." *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Banks*, 510 U.S. 86, 106 (1993). "A component fits within the guaranteed benefit policy exclusion only if it allocates investment risk to the insurer. Such an allocation is present when the insurer provides a genuine guarantee of an aggregate amount of benefits payable to . . . plan participants and their beneficiaries." *Id.*

That description precisely tracks the structure of the Plan. Each month, UCG paid LINA a set amount of money in premiums on behalf of UCG's employees. If any of those employees subsequently made a claim, LINA had agreed to provide a benefit that was determined purely based upon the level of coverage selected by the employee. That

12

amount was guaranteed, regardless of market performance or other variables plans could take into account. This structure qualifies under the guaranteed benefit policy exclusion, meaning that only the policy itself is a Plan asset. *See, e.g.*, *Merrimon v. Unum Life Ins. Co.*, 758 F.3d 46, 56–57 (1st Cir. 2014) (holding that a life insurance policy itself, not the death benefit paid in accordance with the policy, is a plan asset, even when the money is kept in the insurance company's general fund); *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104–07 (2nd Cir. 2011) (same); *see also* 29 U.S.C. § 1101(b)(2).

The Supreme Court's decision in *John Hancock Mutual Life Insurance Co. v. Harris Trust & Savings Bank*, 510 U.S. 86, helps explain this conclusion further. In that case, an insurer received premiums from an employer for a retirement benefit account, earmarked those premiums, and then invested them along with other general assets of the insurance company not associated with the employer's account. *See id.* at 89–91. The insurance company then agreed to allocate to the employer's plan a pro rata share of the gains and losses of the investment attributable to the earmarked funds provided by the employer. *See id.* Thus, the exact level of retirement benefits owed to the plan participants was not guaranteed; they could go up or down based upon market performance. Accordingly, the Supreme Court held that, in regards to the portion of the funds to which the payout was not guaranteed, the plan did not qualify as a guaranteed benefit policy. *See id.* at 106. Thus, those funds did not fall under the statutory exception and were plan assets. *See id.* Unlike in *John Hancock*, however, the Plan at issue in this case is a life insurance contract that provides a fixed payout not contingent on market performance—in other words, a guaranteed benefit policy. That amount is

13

guaranteed by the insurance company, so the premiums paid do not constitute Plan assets. *See* 29 U.S.C. § 1101(b)(2).

Kimberly Gordon asks us to reach a different conclusion in light of the Sixth Circuit's decision in *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield*, 751 F.3d 740 (6th Cir. 2014). In that case, Hi-Lex had a *self-funded* health benefit plan for its employees. *See id.* at 743. That is, Hi-Lex did not pay an insurance company premiums with the expectation that the insurance company would then use its own money to pay claims. Instead, Hi-Lex pooled its money into a fund and then used a third-party administrator (Blue Cross Blue Shield) to manage the fund and pay claims using Hi-Lex's money. *See id.* In exchange for this service, Blue Cross Blue Shield received a monthly per-employee administrative fee paid by Hi-Lex. *See id.* Unbeknownst to Hi-Lex, however, Blue Cross Blue Shield also started keeping an extra fee by marking up the price of hospital services and pocketing the difference. *See id.* Hi-Lex sued and claimed that Blue Cross Blue Shield had breached its fiduciary duty under ERISA. *See id.*

The Sixth Circuit found in favor of Hi-Lex. *See id.* at 742. Referring back to the statutory definition of a "fiduciary," the Sixth Circuit found that Blue Cross Blue Shield had responsibility and control of plan assets—specifically, the money paid from Hi-Lex to go into its benefits fund. *See id.* at 744–47. The Sixth Circuit said it did not matter that Blue Cross Blue Shield kept the money paid by Hi-Lex in its general operating account, rather than in a separate account. *See id.* at 746–47. The important thing was that, even though a formal trust was never created, Blue Cross Blue Shield was still holding the funds "in trust"—used in the common law sense—for Hi-Lex. *Id.* at 747. In

14

so doing, Blue Cross Blue Shield was managing plan assets and thus was acting as a fiduciary under ERISA. *See id.*

Kimberly Gordon argues that we should similarly find the premiums paid to LINA were Plan assets. We do not find that argument persuasive. There is a critical distinction between this case and *Hi-Lex*: *Hi-Lex* involved a self-funded plan. The Department of Labor "consistently has stated that 'the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law.'" *Merrimon*, 758 F.3d at 56 (quoting U.S. Dep't of Labor, Advisory Op. No. 93-14A, 1993 WL 188473, at *4 (May 5, 1993)); *see also Faber*, 648 F.3d at 105 & n.3 (collecting agency documents). Given that guidance, we agree with the Sixth Circuit that the Restatement of Trusts is instructive here. As the Sixth Circuit noted, "When one person transfers funds to another, it depends on the manifested intention of the parties whether the relationship created is that of trust or debt. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or one or more third persons, a trust is created." Restatement (Third) of Trusts § 5 cmt. k (2003) (quoted in *Hi-Lex*, 751 F.3d at 747).

In *Hi-Lex*, that definition militated in favor of finding that Blue Cross Blue Shield was holding the funds "in trust" for Hi-Lex, specifically "for the purpose of paying plan beneficiaries' health claims and administrative costs." 751 F.3d at 747. Because Hi-Lex had a self-funded plan, Blue Cross Blue Shield was responsible for a certain sum of earmarked money that, even if comingled with other assets, was still for the specific use of Hi-Lex. Here, however, the situation is significantly different. UCG had an insurance contract with the CIGNA Defendants. LINA collected premiums, comingled them with

15

other assets, and if a covered employee died, paid a set benefit, regardless of the amount of premiums collected. Such a structure "allocates investment risk to the insurer," the hallmark of a guaranteed benefit plan. *John Hancock*, 510 U.S. at 106. Accordingly, the Plan qualifies for the guaranteed benefit policy statutory exception, and the funds paid to the CIGNA Defendants were not Plan assets, as defined by ERISA. *See* 29 U.S.C. § 1101(b)(2).

We reach this conclusion notwithstanding Kimberly Gordon's argument that excess premiums should be treated differently. She argues that, to the extent the CIGNA Defendants received money they were not owed (for example, the incorrectly inflated premiums Steven Gordon paid as a result of UCG's error in entering his birthdate), those excess premiums should be considered Plan assets. Although we agree that the CIGNA Defendants are not entitled to those excess premiums, we do not agree that they create a fiduciary duty when there was none before. The appropriate remedy in such a case is seeking a refund of the overpayments from the entity that made the error—a remedy UCG offered—or perhaps seeking the difference in insurance benefits from UCG as a result of its error, rather than suing the CIGNA Defendants for breach of fiduciary duty. That is especially true when, as explained later, *see infra* at 22–26, 29, it is clear that the CIGNA Defendants had no meaningful way of knowing they had received an overpayment, thereby indicating they merely possessed the assets without having the knowledge needed to exercise conscious control of them. *See e.g.*, *McLemore v. Regions Bank*, 682 F.3d 414, 423 (6th Cir. 2012) ("Custody of plan assets alone cannot establish control sufficient to confer fiduciary status."); *Chao v. Day*, 436 F.3d 234, 237 (D.C. Cir.

16

2006) (declining to "extend fiduciary status to every person who exercises mere possession, or custody over the plans' assets" (internal quotation marks omitted)); *Herman v. NationsBank Trust Co.*, 126 F.3d 1354, 1365–66 (11th Cir. 1997) ("To exercise is to make effective in action, . . . and a person must have knowledge of his authority or power to control in order to exercise control. In order for a fiduciary to exercise discretion, the fiduciary must engage in conscious decisionmaking or knowledgeable control over assets." (internal quotation marks and citation omitted)).

Notwithstanding the guaranteed benefit policy statutory exception, Kimberly Gordon also argues that the CIGNA Defendants were fiduciaries under the remaining portions of subsections (i) and (iii) of the statute: namely, that the defendants either "exercise[d] any discretionary authority or discretionary control respecting management of [the] plan" or "ha[d] any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). Like the district court, we find that the CIGNA Defendants were not fiduciaries under either of these provisions.

In deciding whether a case falls within these statutory definitions, we first look to the policy documents. *See Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61–62 (4th Cir. 1992). In *Coleman*, the plaintiff's husband participated in a group health insurance policy sponsored by his employer, but issued by Nationwide. *See id.* at 56. The employer provided the policy at no cost to the employees and paid all of the premiums. *See id.* Little did the employees know, however, the employer had defaulted on paying those premiums, which led Nationwide to cancel the policy. *See id.* Coleman's wife, not knowing the plan had been terminated, made a claim under the policy after having a

17

baby. *See id.* at 56–57. Because the policy was defunct, Nationwide denied her claim. *See id.* at 57. Coleman sued and claimed that Nationwide breached its fiduciary duty under ERISA by failing to notify plan beneficiaries that the insurance policy was no longer in force. *See id.*

This Court concluded, however, that Nationwide did not have a fiduciary duty toward Coleman in that respect. *See id.* at 62. The Court explained that, "[t]he discretionary authority or responsibility which is pivotal to the statutory definition of 'fiduciary' *is allocated by the plan documents themselves*." *Id.* at 61 (emphasis added). Accordingly, the Court began its inquiry by thoroughly examining the plan documents. In so doing, the Court determined that "nothing in the formal allocation of responsibilities" in the documents would lead one "to conclude that Nationwide possessed the necessary discretionary authority to render it a fiduciary" required to notify Coleman of the plan's termination. *Id.* Rather, "Coleman's unfortunate situation resulted not from any fault of Nationwide, but from the failure of her husband's employer to fulfill its obligations." *Id.* at 62–63.

It is important to note, though, that this Court made clear in *Coleman* that being a fiduciary under ERISA is not an all-or-nothing situation. Rather, the inquiry must be examined "with respect to the particular activity at issue." *Id.* at 61; *see also Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) ("In every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."). This aspect of the analysis stems from the statutory definition, which refers to an entity

18

being a fiduciary "to the extent" it performs a particular function. *Coleman*, 969 F.2d at 61. Thus, an entity can be a fiduciary for some activities and not others.

After considering the Plan documents, we agree with the district court that the CIGNA Defendants did not have a duty to notify Steven Gordon that he had not completed the evidence of insurability requirement. Rather, the Plan documents reveal that the unfortunate situation in this case resulted not from any fault of the CIGNA Defendants, but from UCG's errors in failing to fulfill its fiduciary duties.

The Plan documents designate UCG as the "Plan Administrator," J.A. 98, which accordingly tasks UCG with "day-to-day program administration," such as "billing, eligibility verification, beneficiary designation, [and] *screening and submitting applications over guaranteed issue*," J.A. 174 (emphasis added). From this broad authority, UCG "appoint[ed]" the CIGNA Defendants as the "Claim Fiduciary" for the Plan. J.A. 98. This delegation gave the CIGNA Defendants responsibility "for adjudicating claims for benefits under the Plan, and for deciding any appeals of adverse claim determinations." *Id.* The Plan documents do not expand the CIGNA Defendants' role beyond that limited capacity. Indeed, they specifically state that the CIGNA Defendants' role of claim fiduciary "does not authorize . . . any fiduciary responsibility with respect to the administration of the Plan. . . . It is understood that [the] Claim Fiduciary's sole liability to the Plan and to Participants and Beneficiaries shall be for the payment of benefits provided with respect to Policies issued by [the] Claim Fiduciary to the Plan." *Id.* This division of responsibilities aligns precisely with the situation described in *Coleman*: "[w]hile it is true that an insurer will usually have administrative

19

responsibilities with respect to the review of claims under the policy, that does not give this court license . . . to impose on [the insurer] the plan administrator's notification duties." 969 F.2d at 62. The same is true here. Thus, like the district court, we agree that the Plan documents did not allocate to the CIGNA Defendants the authority, responsibility, or managerial capacity needed to qualify as a fiduciary under ERISA—at least insofar as it relates to soliciting supporting materials for coverage beyond the guaranteed issue amount or notifying Steven Gordon that he had not completed the evidence of insurability requirement. Under the Plan documents, that responsibility lay with UCG.

Kimberly Gordon points to several specific Plan documents to advocate for a contrary conclusion, but none of them are persuasive. First, she points to a sentence in the Plan's administration manual, which states that the manual was provided "to serve as a guide to [UCG's] role in helping [LINA] administer [UCG's] group insurance plans." J.A. 103. Kimberly Gordon argues that this language is "an admission by the Cigna Defendants that they 'administer' the plan." Appellant's Br. at 38. But she reads too much into this one sentence. In several other places, the Plan documents explain that UCG self-administered the Plan. And UCG even admitted as much. Furthermore, Kimberly Gordon never explains how this one line gives rise to an inference that LINA had the discretionary authority or responsibility with respect to the specific conduct at issue here: soliciting supporting materials for coverage beyond the guaranteed issue amount or notifying Steven Gordon that he had not completed the evidence of insurability requirement. Rather, the Plan documents make clear—consistent with

20

UCG's own admission—that UCG was responsible for "screening and submitting applications over [the] guaranteed issue [amount]." J.A. 174.

Second, Kimberly Gordon points out that LINA provided UCG with a "Summary" of the Plan's terms to give to participants—but that this Summary did not discuss the evidence of insurability requirement for supplemental life insurance coverage. Although Kimberly Gordon is correct on this point, it does not change the analysis. The fact that the evidence of insurability requirement was not discussed in the Summary does not create a fiduciary duty for the CIGNA Defendants to solicit supporting materials to satisfy that requirement, especially given that the policy documents place that duty on UCG. Furthermore, even though the CIGNA Defendants provided this literature to UCG, that fact does not show that the CIGNA Defendants had assumed control over the solicitation of required information from new enrollees. The policy documents squarely place that responsibility on UCG. The same is true of the "Enrollment Guide" cited by Kimberly Gordon—a pamphlet distributed to new employees by UCG. Appellant's Br. at 39. Although the "Enrollment Guide" states that supplemental life insurance coverage was provided "through Cigna" and lists the telephone number for CIGNA, this information did not create a fiduciary relationship. J.A. 230. The CIGNA Defendants may have underwritten the insurance policies, but under the governing Plan documents, UCG, not the CIGNA Defendants, was responsible for properly gathering information from new employees.

Finally, Kimberly Gordon argues that because LINA created and processed the evidence of insurability forms, it "had the responsibility to determine whether an

21

employee had submitted information necessary to satisfy the 'insurability' requirement and to communicate with the employee about that." Appellant's Br. at 40. She further argues that the CIGNA Defendants then had the responsibility to provide certificates of insurance to UCG on behalf of employees who had been approved for supplemental coverage. But these assertions are irrelevant to this case, as it is undisputed that Steven Gordon neither completed nor submitted the evidence of insurability application. Accordingly, as the CIGNA Defendants point out, "even if the underwriting process were fiduciary conduct, LINA cannot be held liable for failing to process an evidence-of-insurability application Gordon admits was never submitted." Appellee's Br. at 39–40.

Similarly, although the CIGNA Defendants would have been the entities to issue an insurability certificate—had they received an application from Steven Gordon—that fact does not change the analysis, because it is undisputed the CIGNA Defendants never received such an application. Nothing in the formal Plan documents would create a dispute of material fact as to whether the CIGNA Defendants had any "discretionary authority," "discretionary control," or "discretionary responsibility" regarding either the "management" or "administration" of the Plan—at least when it comes to soliciting supporting materials for coverage beyond the guaranteed issue amount or notifying new employees that they have not completed the evidence of insurability requirement. *See* 29 U.S.C. § 1002(21)(A). Thus, according to the Plan documents, the CIGNA Defendants were not ERISA fiduciaries in these roles. *See id.*

Our inquiry does not end with the Plan documents, however, as Kimberly Gordon correctly notes. "[W]e must also look beyond the formalities to see if [the insurance

22

company] in fact exercised authority over these sorts of notifications." *Coleman*, 969 F.2d at 61; *see also Custer v. Sweeney*, 89 F.3d 1156, 1161 (4th Cir. 1996) (noting a fiduciary under ERISA "includes not only those named as fiduciaries in the plan instrument . . . but any individual who *de facto* performs specified discretionary functions with respect to the management, assets, or administration of a plan" (internal quotation marks, citation, and alteration omitted)). But, as described earlier, everything in the record shows that UCG was responsible not just formally, but functionally for the specific roles at issue—requesting the information required to enroll new employees and notifying Plan participants if they lacked documents required for supplemental coverage. The most telling piece of evidence on this point is how UCG administered the Plan: each month UCG merely provided LINA with the number of employees covered and the total amount of premiums due; it did not provide individual information about specific employees. Given this arrangement, it is unclear how the CIGNA Defendants could have even known that a particular employee was paying for coverage that had not been approved. UCG simply did not submit that level of detail to LINA or CIGNA, nor was it required by the Plan.

In sum, even when viewing the facts in the light most favorable to Kimberly Gordon, no reasonable jury could find that either of the CIGNA Defendants had a fiduciary duty toward the Gordons with respect to soliciting supporting materials for coverage beyond the guaranteed issue amount or notifying new employees that they had not completed the evidence of insurability requirement. Accordingly, the district court's grant of summary judgment on Count I of the Complaint was appropriate.

23

B.

Kimberly Gordon's second argument is that the district court erred by granting summary judgment on Count II of her Complaint, which alleged that, even if the CIGNA Defendants did not have a fiduciary duty toward the Gordons, they nonetheless were liable for knowingly participating in a breach of trust by a fiduciary. Kimberly Gordon acknowledges that this Court has never formally recognized such a cause of action. During the proceedings below, the district court reasoned that, assuming *arguendo* such a cause of action existed, Kimberly Gordon's claim would still fail. We do the same— assume, without deciding, that such a cause of action exists, but nonetheless conclude that Kimberly Gordon's claim would fail.

Kimberly Gordon acknowledges that an essential element of such a claim would be the "defendant's knowing participation" in a breach by a fiduciary. Appellant's Br. at 44 (quoting *Phones Plus, Inc. v. Hartford Fin. Servs. Grp., Inc.*, Civil No. 3:06CV01835(AVC), 2007 WL 3124733, at *5 (D. Conn. Oct. 23, 2007)).[2] Yet here,

---

[2] Notably, the source of authority cited by Kimberly Gordon for the existence of this cause of action is of questionable validity. Kimberly Gordon cited an unpublished opinion from the District of Connecticut, which was itself quoting an opinion from the Second Circuit, *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270 (2d Cir. 1992). But the Second Circuit has since disavowed the holding in *Diduck* as contrary to dicta from a subsequent Supreme Court opinion. *See Gerosa v. Savasta & Co.*, 329 F.3d 317, 322 (2d Cir. 2003) ("In *Mertens* [*v. Hewitt Associates*], the [Supreme] Court rejected the central holding of *Diduck*, finding that non-fiduciaries who knowingly participate in a fiduciary breach cannot be liable for ordinary money damages."); *see also Mertens v. Hewitt Assocs.*, 508 U.S. 248, 253–54 (1993) ("[W]hile ERISA contains various provisions that can be read as imposing obligations upon nonfiduciaries, . . . no provision explicitly requires them to avoid participation (knowing or unknowing) in a fiduciary's breach of fiduciary duty. It is unlikely, moreover, that this was an oversight, since (Continued)

24

there is no evidence that the CIGNA Defendants knew about UCG's alleged breach of fiduciary duty until after it occurred.

Kimberly Gordon's principal piece of evidence in support of her claim is the denial letter she received from LINA. In that letter, LINA mistakenly referred to Steven Gordon in one place as "Mr. Hungerford." J.A. 213. Kimberly Gordon argues that this error indicates the letter was a form letter and constitutes evidence that LINA was aware that it was accepting excess premiums from another UCG employee. But the record reveals that Mr. Hungerford was not an employee of UCG and did not participate in the UCG-sponsored Plan. Rather, Mr. Hungerford was a former employee of Continental Airlines, a separate company with an entirely separate plan. That some other employer-fiduciary may have erroneously collected premiums during its administration of another plan does not support an inference that the CIGNA Defendants knew of UCG's errors administering the Plan at issue here.

Kimberly Gordon's other argument on this point is similarly unpersuasive. Kimberly Gordon references the fact that, according to the Plan, if UCG fires an

---

ERISA *does* explicitly impose 'knowing participation' liability on cofiduciaries." (quoting 29 U.S.C. § 1105(a))). Other circuits have cited this dicta from the Supreme Court as reason to reject the cause of action advanced by Kimberly Gordon. *See Renfo v. Unisys Corp.*, 671 F.3d 314, 325 (3d Cir. 2011) ("[W]e find *Mertens* persuasive and hold that 29 U.S.C. § 1132(a)(3) does not authorize suit against nonfiduciaries charged solely with participating in a fiduciary breach." (internal quotation marks omitted)); *Reich v. Rowe*, 20 F.3d 25, 29–31 (1st Cir. 1994) (same). Nevertheless, because deciding this unsettled question is not necessary to resolve this case, we decline to rule on whether Count II of Kimberly Gordon's Complaint presents a cognizable cause of action.

employee, that employee is notified of her eligibility for "conversion insurance" by LINA in a notice "mailed to the Insured's last known address as reported by the Employer." J.A. 81. Kimberly Gordon argues that, in order for LINA to send out this notice, it must have addresses for employees, and thus must keep track of them in some form. But that UCG provided LINA with the addresses of some terminated employees provides no evidence that the CIGNA Defendants knew of Steven Gordon specifically or that they knowingly participated in any breach toward him.

Thus, even if we assume, without deciding, that the cause of action Kimberly Gordon advances is cognizable, her claim would still fail, as there is no evidence that the CIGNA Defendants knowingly participated in any breach. Therefore, the district court's grant of summary judgment as to Count II of the Complaint was appropriate.[3]

C.

Finally, Kimberly Gordon argues that the district court erred by granting summary judgment before allowing her to conduct discovery. Kimberly Gordon sought discovery on four issues: (1) whether LINA was a fiduciary in regards to the conduct alleged in the Complaint; (2) if so, how fiduciary duties under the Plan were divided between LINA and CIGNA; (3) what knowledge LINA and CIGNA had with respect to individual

---

[3] Kimberly Gordon also alleges that the district court erred by holding that CIGNA (LINA's parent company) was not a proper party to the proceedings. This opinion has proceeded by assuming, without deciding, that CIGNA was a proper party and nonetheless concludes that both Count I and Count II of Kimberly Gordon's Complaint cannot withstand summary judgment on the merits. Therefore, we need not address the district court's decision that CIGNA was not a proper party.

26

coverage data and premiums under the Plan; and (4) the corporate structure of the various CIGNA entities. We review the district court's ruling denying discovery under Fed. R. Civ. P. 56(d) for abuse of discretion. *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014).

Federal Rule of Civil Procedure 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time to obtain affidavits or declarations or to take discovery." Fed. R. Civ. P. 56(d). "A court should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014). Recently, we found that a district court did not abuse its discretion in denying a motion under Rule 56(d) when two conditions were met: (1) the plaintiff "had a reasonable opportunity" to conduct discovery, and (2) the plaintiff did not "identify any specific information that would create a genuine dispute of material fact." *Hodgin v. UTC Fire & Sec. Ams. Corp.*, 885 F.3d 243, 250 (4th Cir. 2018). Both these reasons also apply to this case, leading us to conclude the district court here similarly did not abuse its discretion.

First, Kimberly Gordon was given a reasonable opportunity to conduct discovery. The CIGNA Defendants agreed to let Kimberly Gordon conduct significant discovery on several topics, including, among others, "the facts concerning Mr. Gordon's enrollment and participation in the plan," "the information provided to [Steven Gordon] related to the plan," "any communication regarding Mr. Gordon's enrollment and participation in the Plan," and "facts concerning when and how LINA/Cigna first learned that Mr.

27

Gordon had requested coverage in excess of the plan's guaranteed issue amount." J.A. 356. What the Defendants would not provide, however, was "discovery concerning plan participants or beneficiaries other than Mr. Gordon." *Id.* Kimberly Gordon's counsel declined to take advantage of this opportunity, due to the "significant gap between" the discovery the CIGNA Defendants offered and what Kimberly Gordon wanted. J.A. 367.

Importantly, CIGNA never moved to deny class certification. Rather, UCG made the motion to deny class certification. CIGNA, on the other hand, moved only for summary judgment. Thus, the discovery CIGNA offered would have provided the information Kimberly Gordon needed to respond to CIGNA's summary judgment motion. True, Kimberly Gordon may have wanted information on other Plan participants to bolster her argument that the case warranted certification as a class action, but the district court *denied* UCG's motion to deny class certification for the very reason that the motion was "premature." J.A. 420. In short, Kimberly Gordon was offered a reasonable opportunity to conduct the discovery relevant to the motion pending and failed to take advantage of that opportunity.

Furthermore, "the information sought [by Kimberly Gordon] would not by itself create a genuine issue of material fact sufficient . . . to survive summary judgment." *Pisano*, 743 F.3d at 931; *accord Poindexter v. Mercedes-Benz Credit Corp.*, 792 F.3d 406, 411 (4th Cir. 2015). As described earlier, the policy documents place the responsibility to calculate premiums, collect premiums, and notify individual Plan participants about their eligibility for insurance coverage with UCG—not with the CIGNA Defendants. More important, however, is the consistent account of events

28

described by both UCG and the CIGNA Defendants. UCG admits that it never had any record of Steven Gordon submitting an evidence of insurability application for supplemental coverage. The CIGNA Defendants also attest, via sworn declaration, that they did not have any record of Steven Gordon applying for that coverage. Furthermore, UCG admits that it did not forward specific employee information to the CIGNA Defendants each month—only the total number of employees covered and the total amount of (self-billed) premiums due (as calculated by UCG). That method of business, which was confirmed by the CIGNA Defendants' sworn declaration—and not disputed by any evidence adduced by Kimberly Gordon—explains how and why the CIGNA Defendants would not have known about Steven Gordon or his failure to submit an application for supplemental coverage. Indeed, the record is devoid of evidence that the CIGNA Defendants knew of Steven Gordon prior to Kimberly Gordon filing her claim for benefits.

It would be one thing if the district court only had the sworn declaration of the CIGNA Defendants, which, as a self-serving document prepared for litigation, could be treated with some degree of skepticism. *See Ingle v. Yelton*, 439 F.3d 191, 195–96 (4th Cir. 2006) (plaintiff is entitled to discovery in an excessive force case in which the only non-law enforcement witness to the police officer's action was fatally shot, because additional evidence would be the only way to contradict the police officer's self-serving statements describing the events). But that is not this case. Instead, we have statements from UCG—contrary to its interests—that admit significant errors on its part. Those admissions by UCG align with the CIGNA Defendants' recounting of the events. Thus,

29

the consistent account of both UCG and the CIGNA Defendants leads to the inevitable conclusion that the error in this case lies solely with UCG. In order for Kimberly Gordon to create a dispute of material fact otherwise, she would have to discover evidence that both UCG and the CIGNA Defendants were lying—and that UCG was lying when it made statements against its own interest. That is a step too far.

Accordingly, in line with our recent precedent in *Hodgin*, we find that the district court did not abuse its discretion in denying Kimberly Gordon's motion under Rule 56(d). Kimberly Gordon was given a reasonable opportunity to conduct discovery and declined to exercise that opportunity; additionally, Kimberly Gordon made no showing that the discovery she sought would have created a genuine dispute of material fact. *See Hodgin*, 885 F.3d at 250–51.

III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.