**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1065

DAVID MCCLURE; AMALGAMATED TRANSIT UNION LOCAL 1300,

Plaintiffs - Appellants,

v.

JAMES PORTS; EARL LEWIS; PAUL COMFORT; LOUIS JONES; KEVIN QUINN,

Defendants - Appellees.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Marvin J. Garbis, Senior District Judge. (1:17-cv-01198-MJG)

Argued: December 13, 2018                                    Decided: January 29, 2019

Before MOTZ, AGEE, and RICHARDSON, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Agee and Judge Richardson joined.

**ARGUED:** Thomas Geoghegan, DESPRES SCHWARTZ & GEOGHEGAN LTD., Chicago, Illinois, for Appellants. Eric Scott Hartwig, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** Daniel B. Smith, AMALGAMATED TRANSIT UNION, Silver Spring, Maryland, for Appellants. Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

DIANA GRIBBON MOTZ, Circuit Judge:

David McClure and the public-sector union he represents, Amalgamated Transit Union Local 1300 ("Local 1300"), brought this 42 U.S.C. § 1983 action asserting First and Fourteenth Amendment claims. They seek to reinstate privileges that granted them special access to restricted Maryland Transit Administration ("MTA") property. They claim that Maryland Department of Transportation officials unconstitutionally limited those privileges in retaliation for McClure's criticism of the MTA. McClure separately contends that the officials violated his constitutional rights by ejecting him from MTA property. The district court granted summary judgment to the transportation officials. McClure and Local 1300 appeal. For the reasons that follow, we affirm.

I.

A.

The MTA employs bus drivers and operations workers represented by Local 1300. MTA employees, on leave of absence to perform union duties full-time, make up Local 1300's executive staff. The collective bargaining agreement between Local 1300 and the MTA governs this arrangement. Article V of that agreement, titled "Union Activity on MTA Premises," provides:

> UNION business shall not be conducted on MTA property, or on MTA's paid time without the permission of a department head or a representative authorized by him/her. However, it is understood that every effort shall be made to cooperate with such UNION representative when and if such permission is sought for the purpose of legitimate UNION business.

The agreement also specifies that Local 1300 "officers, while on leave of absence, shall comply with all MTA regulations pertaining to entry into any part of the MTA's premises, vehicles or other MTA property."

Although the MTA contractually reserved the right to regulate access to its premises, the agency had allowed some Local 1300 officers to maintain access to restricted government property through electronic keycards. One of these officers is Local 1300 President David McClure, who had received broad keycard access to property — like garages and rail terminals — where union members worked.

Two other officers had also retained residual access to MTA property, consistent with their former positions and more limited in scope. For example, Local 1300's vice president previously operated subway trains, so his keycard had remained programmed to access an MTA subway facility. Although the MTA's standard practice is to suspend an employee's access upon leave, it had not done so for these individuals.

B.

On July 8, 2016, Local 1300 launched an advocacy campaign warning against assertedly unsafe MTA policies and operations. In the weeks that followed, Local 1300 issued critical reports, circulated petitions, and hosted town halls; McClure also gave interviews to the media describing the alleged safety hazards.

During this time, McClure continued to perform his ordinary union duties. As part of these duties (and pursuant to the collective bargaining agreement), McClure represented Local 1300 members in their employment disputes with the MTA. On September 15, 2016, McClure appeared at a disciplinary appeal hearing on behalf of a

3

union member. Vastina Holland-Brown, one of two hearing officers employed by the MTA Office of Labor Employee Relations, presided.

Before the hearing began, McClure learned that the disciplined member had retired from his job with the MTA, rendering the appeal moot. McClure sought to withdraw the member's grievance, but Holland-Brown refused the request. McClure reacted by questioning her competence and stating that he would try to keep her from presiding over future Local 1300 cases. Holland-Brown took offense and filed an internal charge with the Maryland Department of Transportation's Office of Diversity and Equity ("ODE"), alleging that McClure verbally harassed her.

The ODE responded by contacting McClure's superior within the Amalgamated Transit Union International's organizational structure, Lawrence Hanley. In a series of letters, ODE Director Louis Jones described McClure's behavior as "intimidating[] and threatening," and so requested assurances that McClure would "conduct himself in a professional manner when engaging [in] union business on MTA property." If not, the MTA would have "no other choice but to require Mr. McClure to obtain permission before entering any MTA offices" in accordance with the terms of the collective bargaining agreement. Additionally, Jones announced that the MTA was suspending McClure's keycard access to its facilities.

McClure did not provide the requested assurances. In the months that followed, he continued to appear at grievance hearings held on restricted MTA property, and he at no point sought permission to do so. This caused the MTA to send another letter on February 21, 2017, restating its permission policy. The letter also suggested that the

4

MTA could conduct hearings at an alternative location, allowing McClure to represent Local 1300 members without involvement of the access restriction.

On March 31, 2017, McClure again tried to attend a grievance hearing in an MTA conference room. When he arrived, Holland-Brown notified her supervisor, who directed police to escort McClure from the premises. A similar situation played out on April 26, 2017: after McClure arrived on MTA property for a hearing, police escorted him out. McClure showed up at two more hearings the next month. Although McClure did not ask the MTA for permission to attend these last two hearings, Local 1300's secretary did notify the agency that he intended to be present. Finding this notification insufficient, the MTA still denied McClure access.

This cat-and-mouse game concluded on June 1, 2017, when the MTA informed McClure that he no longer needed permission to attend hearings at agency offices, as Holland-Brown had retired. But the MTA did not reactivate McClure's keycard. Rather, the agency used the opportunity to review the keycard access of all union officers who had taken leave. It then revoked any residual access the officers maintained from their former MTA positions.

C.

Local 1300 and McClure filed this action against four Maryland transportation officials on May 1, 2017, while the permission policy was still in place.[1]

---

[1] As plaintiffs note, the MTA's voluntary cessation of the permission policy does not render the claim moot. *See Porter v. Clarke*, 852 F.3d 358, 364 (4th Cir. 2017).

As relevant here, plaintiffs alleged three claims under 42 U.S.C. § 1983. They asserted two First Amendment retaliation claims, challenging both the permission policy applied to McClure and the general revocation of Local 1300 officers' keycard access. They alleged that both Local 1300's advocacy campaign and McClure's criticism of Holland-Brown qualified as protected speech, and that the MTA unconstitutionally limited their ability to enter government property as reprisal for that speech. McClure also brought a Fourth Amendment claim, contending that police unlawfully seized him when they escorted him off MTA property.

The MTA moved to dismiss, requesting summary judgment in the alternative and supplementing the pleadings with more than a dozen exhibits. Plaintiffs objected and moved for discovery pursuant to Fed. R. Civ. P. 56(d).

The district court granted summary judgment to the MTA. In doing so, the court accepted that McClure's criticism of Holland-Brown constituted protected speech and it assumed that the MTA changed its access policies to retaliate against this speech. The court nonetheless concluded that plaintiffs' First Amendment retaliation claims failed because the MTA's access policies did not have an unconstitutionally adverse impact on plaintiffs. As to the Fourth Amendment claim, the court held that no unlawful seizure had occurred because the MTA had "reasonably deemed" McClure "to be a trespasser." Finally, the court denied plaintiffs' Rule 56(d) discovery motion, concluding that the MTA's provisional concession as to retaliatory intent obviated any need for it.

6

II.

Plaintiffs initially and principally challenge the district court's grant of summary judgment on their First Amendment claims. We review that grant de novo, accepting plaintiffs' factual allegations as true and drawing all reasonable inferences in their favor. *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

As a general matter, public officials may not respond to "constitutionally protected activity with conduct or speech that would chill or adversely affect [t]his protected activity." *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006). That is so "even if the act, when taken for different reasons, would have been proper." *ACLU of Md., Inc. v. Wicomico Cty.*, 999 F.2d 780, 785 (4th Cir. 1993). To succeed on a First Amendment retaliation claim, a plaintiff must show: "(1) [the] speech was protected, (2) the alleged retaliatory action adversely affected [the] protected speech, and (3) a causal relationship [existed] between the protected speech and the retaliation." *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015) (internal quotation marks omitted).

Here, it is undisputed that plaintiffs engaged in activity protected by the First Amendment. *See Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 464 (1979) ("The First Amendment . . . protects the right of associations to engage in advocacy on behalf of their members."). Moreover, for the purposes of the summary judgment motion, the district court assumed that the MTA imposed the challenged policies — namely, the permission requirement and the keycard suspension — to retaliate against this protected activity. We will do the same. All that is left to consider then is

7

the second element: whether the MTA's actions against Local 1300 amounted to unconstitutionally adverse behavior.

Plaintiffs allege that the MTA's access policies had multiple adverse effects. Most obviously, the policies prevented McClure from entering restricted MTA property without threat of removal. Plaintiffs also assert that the policies stigmatized McClure as one who behaved inappropriately. They contend that these policies put McClure in a bind where compliance would mean losing face with union members and resistance would mean risking his ability to advocate on their behalf. Plaintiffs further argue that the policies generally made it harder for Local 1300 officers to communicate with union members.

To establish an adverse effect, plaintiffs need not "show that the action taken in response to [their] exercise of constitutional rights independently deprives [them] of a constitutional right." *Wicomico*, 999 F.2d at 786 n.6. But "when a private citizen is the speaker and a public official is the retaliator," the "nature of the retaliatory acts impacts whether those acts are actionable." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000). In this context, retaliation "may be justified [i.e., not actionable] when legitimate countervailing government interests are sufficiently strong" to override the private interest in the challenged action. *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996).

Given the nature of the action and the competing interests at stake in this case, we conclude that the challenged "government action[], due to [its] nature, [is] not actionable." *Balt. Sun*, 437 F.3d at 416. This is so because plaintiffs' interest in

8

maintaining access to restricted MTA property is slight when compared to the government's interest in regulating such access.

Plaintiffs undoubtedly have an interest in accessing MTA property to interact with and support union members. But as they conceded before the district court, Local 1300 officers have never been *entitled* to uninhibited access to MTA property. The collective bargaining agreement states that Local 1300 "officers . . . shall comply with all MTA regulations pertaining to entry into any part of the MTA's premises."[2] Thus, far from having any right to access MTA property, union officers enjoyed only a temporary privilege of special access. Further, it is important to note that the union's access to *MTA property* is wholly separate from its access to *grievance hearings*. Even though the officers objected to the MTA's access regulations, they remained free to schedule hearings at "alternative location[s]" where they could fully represent their members.

In contrast, the MTA has "inherent" authority to regulate its restricted areas in any way that is "compatible with the intended purpose of the property." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 (1983). And it here has a plain and weighty interest in maintaining control over restricted areas, like private offices and garages with heavy machinery, which are used for purposes other than citizen speech. *See United States v. Kokinda*, 497 U.S. 720, 725 (1990) (requiring balancing when the

---

[2] Plaintiffs now suggest that the agreement goes beyond these terms, citing *Bonnell/Tredegar Indus., Inc. v. NLRB*, 46 F.3d 339, 344 (4th Cir. 1995), for the proposition that "past practice can become an implied term of a collective bargaining agreement." But plaintiffs waived that argument by failing to develop it in their opening brief and taking only a "passing shot" in their reply brief. *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (internal quotation marks omitted).

"governmental function operating is not the power to regulate or license, as lawmaker, but, rather, as proprietor, to manage its internal operations" (internal quotation marks and alterations omitted)). The MTA's interest is thus "sufficiently strong," *Umbehr*, 518 U.S. at 675, to overcome plaintiffs' interest in special access.[3]

We held as much in *Wicomico*. There, an ACLU paralegal claimed that a prison violated her First Amendment rights when it withdrew special privileges allowing her to visit inmates in rooms reserved for attorneys and clergy. *See Wicomico*, 999 F.2d at 785–86. The prison revoked the privileges after the ACLU filed a lawsuit using information gleaned from these visits, creating "tension among prison employees and heighten[ing] administrators' concerns about staff and inmate contact with outsiders." *Id.* at 782.

Accepting that the paralegal's speech was protected and the prison's action was retaliatory, we nonetheless held that the withdrawal of a special access privilege "did not chill, impair, or deny the[] exercise of First Amendment rights" because the ACLU paralegal remained "free to visit with inmates in secure, non-contact meeting rooms . . . which is all that [the prison] provides to any paralegal or other non-professional visitor." *Id.* at 786. We further explained that just because the prison deviated from its general

---

[3] The district court, following our lead in earlier cases, concluded that plaintiffs' First Amendment claims failed because the access policies posed only a "de minimis" inconvenience to them. *McClure v. Ports*, No. MJG-17-1198, 2017 WL 6447185, at *8 (D. Md. Dec. 18, 2017); *see, e.g.*, *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). Plaintiffs insist that the access policies constituted more than a "de minimis" burden. This may be so in a colloquial sense. But in the context of First Amendment retaliation claims, our "de minimis" label is shorthand for cases where, as here, the government's legitimate interests in managing its own functions are so strong that they dwarf the opposing private interests.

10

policy to make a special accommodation did not mean it was "bound to continue the practice." *Id.*; *see also Umbehr*, 518 U.S. at 675 ("[T]he First Amendment does not create property or tenure rights, and does not guarantee absolute freedom of speech.").

So too here. MTA officials extended a courtesy to Local 1300 officers by allowing them keycard access to spaces closed to the general public. This grant of access was purely discretionary, with no process governing it. When McClure upset an MTA employee by criticizing her work, the MTA revoked this discretionary courtesy and further asked McClure to seek permission before attending hearings where that same employee might be in attendance. Like the prison in *Wicomico*, the MTA has a critical interest in managing a productive work environment for its employees and limiting outside disruptions. And for their part, Local 1300 officers remain free to represent their members at hearings off-site or obtain authorization to enter MTA offices for these purposes. As such, the effect of the MTA's access policies is not sufficiently adverse to support a First Amendment retaliation action.[4]

---

[4] In an effort to save their claims, plaintiffs insist that we must apply strict scrutiny here because the MTA exercised "unbridled discretion" by limiting their access to a type of public forum. We doubt that forum analysis has any role in a retaliation inquiry, and plaintiffs do not cite a single retaliation case to support this novel suggestion.

But even if plaintiffs could shoehorn forum analysis into the retaliation framework, their argument would fail. The MTA would have needed to "intentionally open[]" its garages, rail terminals, and office spaces for the purposes of "public discourse" to convert these restricted spaces into limited public fora. *Child Evangelism Fellowship of MD, Inc. v. Montgomery County Pub. Sch.*, 457 F.3d 376, 382 (4th Cir. 2006) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)). The MTA did not go so far when it scheduled closed personnel hearings in its conference rooms — particularly given that it offered to hold these hearings at reasonable alternative locations.

III.

McClure's contention that his Fourth Amendment rights were violated when police escorted him from MTA property also fails. Like the district court, we conclude that the police acted reasonably without reaching the question of whether the challenged acts qualified as seizures.

The Fourth Amendment "guarantees the right to be free from unreasonable . . . seizures." *Bailey v. United States*, 568 U.S. 186, 189 (2013). An officer may arrest someone without violating the Fourth Amendment if the officer "has probable cause to believe that an individual has committed even a very minor criminal offense in his presence." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

Maryland law makes it a crime for a person to "refuse or fail to leave . . . a specific part of a public building . . . during regular business hours if":

> (1) the surrounding circumstances would indicate to a reasonable person that the person who refuses or fails to leave . . . has no apparent lawful business to pursue at the public building . . . and
> (2) an authorized employee of the government unit asks the person to leave.

Md. Code Ann., Crim. Law § 6-409(b). The Court of Special Appeals of Maryland, construing the statutory precursor to § 6-409, has held that "lawful business" includes "any constitutionally protected activity." *Kirstel v. State*, 284 A.2d 12, 16 (Md. Ct. Spec. App. 1971). But it also cautioned that a property's "public character . . . does not grant to individuals a license to engage in activities which disrupt the activities to which those facilities are dedicated." *Id.* (internal quotation marks omitted).

12

McClure sought entry to MTA property during regular business hours to attend lawful meetings, but McClure's lawful purpose did not give him carte blanche to access restricted MTA offices. Moreover, the MTA had explicitly barred him from entering its restricted property without permission. When McClure sought to enter the MTA building without permission and refused to leave when asked to do so by an authorized person, a reasonable person considering the totality of circumstances would conclude that there was probable cause to believe McClure had violated § 6-409.

As such, there was no Fourth Amendment violation.

IV.

Finally, we turn to plaintiffs' contention that the district court abused its discretion by denying their discovery requests. When a party objects to summary judgment and files a Rule 56(d) motion, a court "may" allow discovery to proceed if that party "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). But if "the information sought would not by itself create a genuine issue of material fact sufficient for the nonmovant to survive summary judgment," then a court may deny the motion. *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014). We review such a denial for abuse of discretion. *Id.*

The district court assumed that plaintiffs satisfied many of the elements of their claims. Only two narrow issues remained in dispute: whether the MTA's policies had an actionable adverse impact and whether the police escorts of McClure from MTA property were reasonable. Plaintiffs identified nine issues in their Rule 56(d) motion, seven of

13

which directly concerned the retaliatory intent element of the First Amendment claims. This intent element was not in dispute, so the district court acted well within its discretion to deny discovery on those seven issues. Only two requests require additional consideration.

As to their First Amendment retaliation claim, plaintiffs sought "discovery as to the past practice of the MTA in allowing the union officers to have access to MTA property without permission and by use of card swipes, including evidence that defendant officials were well aware of this practice and had no objection to it until the plaintiffs began engaging in the protected speech." Although past practice could be relevant to the meaning of the collective bargaining agreement — as plaintiffs belatedly argue now — they framed the issue below as one of intent. As a result, they conceded before the district court that this request was unnecessary given the court's assumption that the MTA acted with retaliatory animus.

For their Fourth Amendment claim, plaintiffs requested information "as to actions taken by Defendants to eject McClure from MTA property, including what eyewitnesses saw." This information could have relevance as to whether the actions of police escorts qualified as seizures. But the district court properly resolved this claim solely on reasonableness grounds, and so was within its discretion to deny discovery.

Finally, plaintiffs generally assert that the grant of summary judgment without "normal discovery" prejudiced them. Of course, Rule 56(d) discovery requests are "broadly favored and should be liberally granted," *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 484 (4th Cir. 2014) (internal quotation marks omitted), but a court need not

14

allow discovery unless a plaintiff identifies material, disputed facts. Plaintiffs did not do so here.[5] Because plaintiffs' Rule 56(d) motion did not identify any factual issues that were essential to their opposition, we find no reversible error.

V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

---

[5] Though plaintiffs claim that the district court's reliance on the MTA officials' affidavits prejudiced them, they have never challenged the substance of these affidavits.

15